**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** **Plaintiff,** **v.** **AUSTAL LIMITED and AUSTAL USA, LLC,** **Defendants.** | **Civil Action No. 24-cv-00307** |

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiff, United States Securities and Exchange Commission ("SEC"), alleges as follows against Defendants Austal Limited ("Austal") and Austal USA, LLC ("AUSA") (collectively, "Defendants").

### I.    INTRODUCTION

1.    From at least January 2013 through at least July 2016 (the "Relevant Period"), Defendants, acting through their executives, engaged in a deceptive scheme to fraudulently overstate revenues and earnings before interest and tax ("EBIT"). Through the actions of certain personnel of AUSA, Austal, an Australian defense contractor, and AUSA, Austal's wholly owned United States subsidiary, orchestrated the fraud in order to meet or exceed analyst consensus estimates for Austal's EBIT, a key financial metric used by analysts and investors.

2.    Defendants' misconduct involved AUSA using artificially low estimates at completion ("EAC") for certain Littoral Combat Ships ("LCS") that AUSA built for the United States Navy ("Navy"). This misconduct allowed AUSA to reduce the EACs by tens of millions

of dollars for certain ships that AUSA built for the Navy. The artificially low EACs caused AUSA to report inflated revenue and EBIT to Austal. In turn, Austal publicly reported overstated revenue and EBIT in its filings that were available to United States investors.

3.      Defendants, through the actions of certain personnel of AUSA, carried out the scheme by improperly reducing estimated costs from the EACs for the LCS program. In particular, Defendants, through the actions of AUSA's former president, Craig Perciavalle, AUSA's former director of financial analysis, Jospeh Runkel, and AUSA's former director of AUSA's two shipbuilding programs, William Adams, instructed AUSA personnel to arbitrarily lower EACs for the LCS program to meet AUSA's budgets (and, in turn, increase revenue from period to period).

4.      As a result of the deceptive scheme, by no later than the financial period ended December 31, 2013 (reported to the investing public on February 27, 2014) through at least the financial period ended June 30, 2015 (reported to the investing public on August 26, 2015), Austal prematurely recognized revenue and met or exceeded analyst consensus estimates for EBIT.

5.      During the time period of these false financial filings, Austal's stock price (as represented in Australian dollars ("AUD")) increased in value – going from approximately 0.88 AUD per share during late February 2014 to approximately 2.40 AUD per share by late November 2015.

6.      By engaging in this deceptive conduct, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c). In addition, Austal violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-

5(b), and AUSA aided and abetted Austal's misconduct by knowingly or severely recklessly providing substantial assistance to Austal's violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 thereunder. Unless restrained and enjoined, Defendants will continue to violate the federal securities laws.

## II.    DEFENDANTS

7.    **Austal Limited** is an Australian corporation with its principal place of business in Henderson, Australia. Austal is a global defense prime contractor and a designer and manufacturer of defense and commercial ships. Austal trades on the Australian Securities Exchange ("ASX").

8.    **Austal USA, LLC** is an Alabama limited liability company, with its principal place of business in Mobile, Alabama. Austal Holdings, Inc., an Alabama corporation, is wholly owned by Austal, and Austal Holdings, Inc. owns AUSA.

## III.    PREVIOUSLY CHARGED PARTIES

9.    **Craig Perciavalle** is 53 years old and resides in Mobile, Alabama. Perciavalle served as AUSA's president from December 13, 2012, until his resignation on February 22, 2021. As president of AUSA, Perciavalle exercised control over the management, general operations, and policies of AUSA, as well as the conduct which violated the securities laws. Perciavalle invoked the Fifth Amendment privilege against self-incrimination in testimony concerning the facts at issue in this Complaint.

10.    **Joseph Runkel** is 55 years old and resides in Mobile, Alabama. Runkel served as AUSA's director of financial analysis from 2009 until April 1, 2023. Runkel invoked the Fifth Amendment privilege against self-incrimination in testimony concerning the facts at issue in this Complaint.

11.    **William Adams** is 64 years old and resides in Mobile, Alabama. Adams served as director of AUSA's Littoral Combat Ships ("LCS") program from 2010 through approximately July 2015, and then as director of AUSA's Joint High Speed Vessels ("JHSV") program. Adams left AUSA in January 2021. Adams is currently employed at a company that provides electrical components and support for shipbuilders. Adams invoked the Fifth Amendment privilege against self-incrimination in testimony concerning the facts at issue in this Complaint.

### IV.    JURISDICTION AND VENUE

12.    The SEC brings this action, and the Court has jurisdiction over this action, pursuant to Exchange Act Sections 21(d)(1) (action for injunction in district court), 21(d)(3)(A) (action for penalty in district court), 21(e) (action for injunction in district court), and 27(a) (district court's jurisdiction), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(d)(5), 78u(e), and 78aa(a).

13.    The SEC seeks: permanent injunctions against Defendants under Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and a civil penalty against AUSA under Section 21(d)(3)(A) of the Exchange Act, 15 U.S.C. § 78u(d).

14.    The Court has personal jurisdiction over Defendants, and venue is proper in the Southern District of Alabama, pursuant to Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa, because many of the acts and transactions constituting violations of the Exchange Act occurred in this district. In addition, AUSA had its principal place of business in this district at the time of the conduct alleged, Austal's officers and directors traveled to and were in this district and to AUSA's offices to conduct Austal's business during the time of the conduct alleged, and one or more investors reside in this district.

15.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means and instruments of transportation or communication in interstate commerce, or the mails, including emails and telephone calls between Austal executives in Australia and AUSA personnel in, among other locations, Alabama, AUSA's transmission of its management accounts via email to Austal, and Austal's publication of its reports, presentations, and press releases on its website in Australia.

## V.     FACTUAL BACKGROUND

### A.     Austal and AUSA's Business.

16.     Austal is a global defense prime contractor and a designer and manufacturer of defense and commercial ships. It is an Australian corporation with its principal place of business in Henderson, Australia, and its common stock ("Ordinary Shares") trades in Australian dollars on the Australian Securities Exchange ("ASX").

17.     During the Relevant Period, Austal traded Level 1 sponsored American Depository Shares ("ADRs") on the American over-the-counter ("OTC") market under the symbol AUTLY. An ADR is a negotiable certificate issued by a U.S. depository bank representing a specified number of shares of a foreign company stock. Bank of New York Mellon issued the Austal ADRs. An Austal ADR is equivalent to ten shares of Austal stock trading on the ASX. On May 21, 2021, Austal terminated its ADR program. Austal's Ordinary Shares trading on the ASX also trade on the American OTC market under the symbol AUTLF.

18.     Austal's ADRs, its Ordinary Shares trading on the ASX, and its Ordinary Shares trading on the American OTC are securities within the meaning of Section 3(a)(10) of the Exchange Act, which defines a "security" to include, among other things, "any…stock" or any "receipt for" stock.

19.     Austal's fiscal year runs from July 1 to June 30, and it files half-year and fiscal year annual reports and announcements with the ASX, and posts those same reports, financial statements, and announcements on its website (www.austal.com). Austal's website is available for viewing by U.S. investors. A page on the Austal website was entitled "U.S. Investors-ADR Program," and it provided information on Austal's ADR program.

20.     Analysts who followed Austal's stock compiled reports about its key financial metrics, including EBIT. EBIT is a proxy for earnings and analysts and investors use it to assess the performance of a company's core operations without the costs of the capital structure and tax expenses affecting profit. Austal's targeted EBIT was also important to Austal and AUSA. As further explained below, Austal directed that AUSA meet certain targets for EBIT, and Austal often touted the EBIT it achieved in its press releases.

21.     Austal prepared its financial statements in accordance with Australian Accounting Standards ("AAS") and complied with International Financial Reporting Standards ("IFRS"). These accounting standards required Austal to use the "latest available, reliable information" to calculate the EACs. *See* International Accounting Standard ("IAS") 8.32. Austal's reports and financial statements, which Austal published on its website, represent that Austal's financials are prepared in accordance with AAS and comply with IFRS.

22.     AUSA is an Alabama limited liability company, located in Mobile, Alabama, and is wholly owned by Austal. During the Relevant Period, AUSA was governed by its own Board of Managers, consisting of Austal's former chairman, Austal's former chief executive officer ("CEO"), Perciavalle (in his role as AUSA's president), AUSA's former chief financial officer ("CFO") (who is deceased), and three outside managers. AUSA also prepared its financial statements to comply with IFRS.

23.    During the Relevant Period, AUSA's financials were reported as part of Austal's, both as part of Austal's consolidated financials and separately in a discussion of AUSA's operations, and appeared in Austal's half-year and annual reports.

24.    During the Relevant Period, AUSA generated more than 75% of Austal's revenue. AUSA generated this revenue largely from AUSA's shipbuilding contracts with the Navy.

**B.    Austal's Navy Contracts and Revenue Recognition**

25.    During the Relevant Period, AUSA served as the prime contractor on Navy contracts to build the ships for the LCS, and built both at its Mobile, Alabama shipyard. LCS ships are 418-foot aluminum combat ships.

26.    In December 2010, the Navy awarded Austal contracts to build LCS ships as the prime contractor. The ships are numbered using only even numbers. During the Relevant Period, AUSA built and reported on eleven ships, LCS 6 through 26. AUSA continues to build these ships for the Navy.

27.    During the Relevant Period, Austal and AUSA used EACs as part of a formula to recognize revenue. The EAC for each ship is the estimate of total costs for the completed ship. EACs consist of material costs (such as the cost of aluminum and steel), labor costs (such as the cost to pay employees and contractors) and overhead expenses already incurred, plus estimated future material, labor, and overhead costs to complete the ship. Each ship had its own EAC during construction and the EACs for the ships in progress were combined to generate an overall EAC.

28.    The total revenue Austal received for each ship was based on the Navy contract, and Austal recognized that revenue period by period based on progress towards completion, with Austal recognizing the full amount on completion. Progress was determined by measuring

expenses actually incurred to date compared to the EAC for the ship. As the material, labor, and overhead costs were actually incurred, a lower EAC number caused Austal to show greater progress towards completion and, as a result, recognize more revenue during that period.

29.     AUSA calculated monthly financial numbers, including revenue and profit, which it reported to Austal monthly in spreadsheets called "Management Accounts." Austal incorporated the financial data in the Management Accounts provided by AUSA into Austal's half-year and annual reports.

30.     In addition to its public financial reporting, AUSA's Navy contracts required AUSA to submit certain monthly reporting to the Navy on the status of each ship's progress through the EVMS. These monthly reports, called "Contract Performance Reports" ("CPRs"), were prepared by AUSA personnel, and included a latest revised estimate EAC (hereinafter, the "Navy EACs").

### C.     Austal's Budgeted Revenue and EBIT.

31.     Austal had an annual budgeting process and it budgeted AUSA to generate certain amounts of revenue and EBIT for each reporting period. By at least the beginning of and continuing throughout the Relevant Period, Austal pressured AUSA to meet its budgeted revenue and EBIT. For example, on or about February 27, 2013, Austal's former CEO emailed Perciavalle in response to an email informing Austal that AUSA's EBIT and revenue were less than the budget for the month. Austal's former CEO scolded Perciavalle about AUSA's "under budget performance," urged him to "hit the quarter and year end budget numbers," and warned him that "investors . . . expect us to keep our promise . . . and will not tolerate under delivery." Perciavalle responded: "I fully understand the importance in meeting our commitments and will continue to drive toward that end."

32.     Similarly, on or about January 9, 2015, Perciavalle texted the former AUSA CFO a copy of certain AUSA EBIT targets that Austal's former CEO had given Perciavalle for half-year 2015 and fiscal year 2015. Perciavalle sent these target numbers to the former AUSA CFO with direction to meet these targets. Perciavalle and the former AUSA CFO continued to text each other and discussed how to manipulate the EACs to meet the target EBIT numbers.

33.     The manipulation was successful as AUSA's final EBIT for half-year and fiscal year 2015 exceeded AUSA's EBIT listed in Perciavalle's text.

**D.     Defendants Knew AUSA Could Not Achieve Austal's Financial Targets.**

34.     During the Relevant Period, through the actions of certain personnel of AUSA, Defendants knew, or were severely reckless in not knowing, that AUSA could not achieve Austal's financial targets. AUSA's initial LCS bid did not sufficiently account for rising costs, change orders, or other issues that contributed to cost overruns. AUSA's budgeted revenue and EBIT for period to period, however, was based on the LCS bid costs, and so the rising costs of building the LCS meant that AUSA was not meeting its budgeted revenue and EBIT.

35.     During the build of LCS 6, and at the latest by December 2013, it was clear that it would be impossible to meet Austal's demands to generate enough revenue in a reporting period to achieve the targeted EBIT. This was because AUSA's actual costs to build LCS 6 far exceeded AUSA's budgeted costs in its Navy bid.

36.     AUSA had detailed information, which it received in weekly LCS meetings, which showed that the estimated material and labor costs exceeded the costs on which AUSA had based its bid for the LCS contract.

37.     Additionally, AUSA had detailed information showing that the cost to build each new LCS ship was rising.  For example, AUSA had to purchase over twice the amount of

aluminum sheets for each LCS ship than initially budgeted because it underestimated the amount of aluminum sheets each LCS ship would require.

38.     AUSA's labor costs were also higher than the labor bid costs and were rising with each LCS ship. For example, it was difficult to find welders with experience welding aluminum, so instead of hiring welders who could immediately start doing the job necessary to complete the ships, AUSA spent labor hours teaching those workers aluminum welding. Also, AUSA struggled to hire and retain the skilled labor needed to build the ships.

### E.     Austal Prematurely Recognized Revenue.

#### 1.     Manipulation of Material EACs.

39.     AUSA and Austal manipulated the LCS EACs related to material costs by failing to include all the estimated cost growth in the EACs.

40.     AUSA calculated the LCS material EACs based on: (a) actual costs of material already purchased; and (b) estimated costs of material to be purchased to complete the LCS. One of the AUSA LCS material manager's ("Material Manager") duties was to calculate the EACs.

##### a)     The Material Manager Documented Demands to Falsify the EACs.

41.     At various times during the Relevant Period, Runkel and Adams instructed the Material Manager to falsely reduce the LCS material EACs below the true costs. The Material Manager wanted AUSA to recognize the actual cost growth and to use the EACs she calculated, which she wanted to base on the "latest available, reliable information." Instead, Adams and Runkel provided AUSA's Material Manager with manufactured EACs and directed her to use the manipulated numbers to reach Austal's financial targets. Runkel and Adams provided the manipulated EAC numbers for the LCS program to the Material Manager using disposable sticky

notes to conceal the fraud and make sure it was untraceable in AUSA's electronic or physical records.

42.     The Material Manager resisted these directives to falsely reduce the LCS material EACs below the true costs by, among other things, discussing her opposition with Runkel and Adams, and questioning the use of phony EACs.

43.     On or about January 10, 2013, the Material Manager wrote in an email to herself that Runkel and the former AUSA CFO instructed her to lower the LCS program EACs that she had calculated. The Material Manager's memo stated: "My numbers were good but Runkle [sp] said lower [the Estimate to Completion]…" The Estimate to Completion ("ETC") is the estimated amount of future expenses needed to complete the ship. This amount is added to costs already incurred to calculate the EAC.

**b)     AUSA Used Phony "Challenges" to Hide Cost Growth.**

44.     During the Relevant Period, AUSA did not include all the estimated material cost growth in the EACs for the LCS program.

45.     In order to conceal the true estimated cost growth of the materials, AUSA improperly reduced the EACs for the LCS program, terming these reductions "management challenges" or "program challenges." AUSA designed these "challenges" to appear as legitimate ways to reduce the LCS material costs.

46.     In reality, however, these so-called "challenges" were equal to the amount of LCS estimated cost growth that AUSA did not want to include in that financial period's EAC. The amount of "challenges" increased over time so that almost none of the additional estimated cost growth was included in the LCS program EACs.

47.     For example, on or about April 18, 2013, the Material Manager emailed herself to document that Adams instructed her to manipulate the LCS EACs through a "challenge" process.

She wrote "[t]oday we were asked by [Adams] to modify the LCS EAC's… I explained to [Adams] that he needed to give me reasons for the reductions and I did not want to modify the values to meet a number." She further described that Adams "said he will take challenges such as material returns . . . to make up the deltas" and explained that she "needed the board numbers to know what numbers [she] had to hit."

48.      Under the applicable international accounting standard, Defendants must prepare, but failed to do so, EACs based on the "latest available, reliable information." *See* IAS 8.32.

49.      Nonetheless, the "management challenges" were unsupported and not tied to specific, realistic, or achievable costs of the materials required to build each LCS. Rather, the "challenges" were the estimated cost growth that AUSA did not want to include in the LCS program EACs sent to Austal.

50.      Although AUSA knew the challenges were unrealistic, AUSA continued to apply the challenges to the total material EACs for the LCS program that were reported to Austal.

51.      In the spring of 2016, when the Materials Manager would complain, Adams told the Material Manager that if she wanted to keep her job, she should not discuss the management challenges with the Austal CFO.

52.      The Material Manager reduced the LCS program EAC calculations as instructed, but also maintained a spreadsheet to memorialize the material EACs she calculated as compared to the artificially reduced material EACs that AUSA reported to Austal.

          c)      **AUSA's Weekly Meetings Discussed the Phony "Challenges."**

53.      On every Friday throughout the Relevant Period, AUSA had weekly LCS Executive Review Meetings, multi-hour meetings attended by AUSA personnel involved in all aspects of the LCS shipbuilding process, who presented on the status of each LCS under construction. These meetings included weekly PowerPoint presentations containing slides with

the monthly material EACs and documented both the Material Manager's LCS EACs as well as the challenges applied to lower them.

54.     For example, the August 2, 2013 Executive Review Meeting featured a chart showing the material EAC for LCS 6 for June 2013. After costs increased by at least $2 million, the chart listed a "Program Challenge," showing a $2 million reduction from the material EACs for LCS 6. This "Program Challenge," however, was not tied to any specific reduction in cost and did not explain how the estimated material costs to finish the ship might be lowered by $2 million.

55.     A year later, a similar slide presented at an August 1, 2014 Executive Review Meeting included the LCS 6 material EACs for June 2014. The slide referred to a "Program Offset," rather than a Program Challenge, but contained the same type of information and functioned like the Program Challenge. Perciavalle directed the Material Manager, through an instruction to Adams, to delete the explicit reference to a "Program Challenge" in the slides to conceal from others not involved in the EAC process that AUSA was applying an offset to arbitrarily lower the EACs in the LCS program.

56.     The weekly LCS Executive Review presentations throughout the Relevant Period demonstrate AUSA's knowledge that: (1) the estimated material costs to complete the LCS were increasing over time; and (2) the phony "challenges" did not lead to cost reductions (because they were unsupported amounts AUSA used to justify lowering the EACs in the LCS program).

### 2.     Manipulation of Labor EACs.

57.     AUSA's estimated labor costs to build a LCS ship were higher than the estimated labor costs that it used in the Navy bid. Instead of including these costs in the LCS labor EAC, AUSA manipulated the labor hours (which hours were then converted to a labor cost EAC) to more closely align them with the amount used for AUSA's Navy bid.

### a)    AUSA Was Aware of the Rising Labor Costs.

58.    From approximately mid-2015 forward, AUSA was aware of the rising labor cost numbers because the new LCS program director met weekly with Perciavalle to discuss the rising costs.

59.    Additionally, the Executive Review Meeting presentations referenced above (*see* ¶ 53) contained PowerPoint slides with the weekly labor hours data and labor EACs, showing: (1) that the LCS labor EACs were much higher than the bid labor EACs and continuing to grow; and (2) a trend of increased labor hours as ships neared completion.

60.    January 2015 text messages between Perciavalle and the former AUSA CFO (*see* ¶32) also show that AUSA intentionally manipulated the labor EACs in the LCS program because they were too high. In those messages, Perciavalle asks the former AUSA CFO whether it easier to manipulate material or labor.

### b)    AUSA Knew that Labor Costs Were Coming In Higher than the Navy Bid.

61.    During the Relevant Period, AUSA used different methods to estimate the labor hours (and so labor EACs) to complete the LCS ships. These methods usually showed the labor hours necessary to build the ships in the LCS program were higher than the Navy bid. Nevertheless, AUSA continued to use either only the labor hours already incurred on the earlier ships (which they had to include in the LCS labor EACs) or, for the ships early in construction, the Navy bid labor EACs.

62.    Perciavalle was aware that the EACs in the LCS program differed depending on the calculation method. Indeed, Perciavalle instructed AUSA personnel to submit the higher LCS labor EAC numbers to the Navy to support AUSA's shipbuilding schedule. Although AUSA

received and analyzed this data, AUSA initially continued to base the LCS labor EACs on the hours that were included in the original LCS Navy bid.

### c)      AUSA Manipulated Labor EACs.

63.      Later in the Relevant Period, in an attempt to estimate labor costs for the ships early in their construction cycle, AUSA applied a "learning curve" to the labor hours required to build subsequent LCS ships under the Navy contract. This "learning curve" method assumed that labor hours would significantly decrease on each subsequent ship. More specifically, the 90% "learning curve" assumed that the labor hours (and so EACs) of each subsequent LCS ship would be 90% of the labor costs for the LCS ship built before it ("90% Learning Curve"). In reality, the 90% Learning Curve was just another way that AUSA tried to justify a reduction in the overall labor EACs to meet Austal's targets.

64.      AUSA began using the estimated labor hours based on the 90% Learning Curve for the labor EACs in the LCS program. However, applying the 90% Learning Curve to ships early in construction resulted in labor hours that were completely inconsistent with the labor hours actually used to build the first few LCS ships.

### F.      Austal Made False Filings, Press Releases, and Investor Presentations.

65.      AUSA reported its financials to Austal. Austal reported its financials on Austal's website, in press releases, and in public filings made in Australia on the ASX.

66.      Austal's filings, press releases, and investor presentations that contained or discussed Austal's financial statements and results and the amount Austal's revenue and EBIT, and included Austal's fraudulent revenue and EBIT, included at least the following:

Half-year H1 2014, ending December 31, 2013

    a.  Austal H1 Half-Year Report, 31 December 2013, issued on February 27, 2014, attaching financial statements and containing discussion of financial results;

b. Austal H1 FY14 results presentation, issued on February 27, 2014, containing discussion of financial results; and

c. Austal press release "Austal Reports Strong Growth," issued on February 27, 2014, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for H1 half-year 2014, Austal's revenue was approximately AUD 507.6 million (approximately $450.3 million) and EBIT was AUD 18.7 million (approximately $16.5 million). For this period, Austal reported that AUSA had approximately AUD 419.8 million (approximately $372.5 million) in revenue and AUSA EBIT was AUD 26.9 million (approximately $23.9 million). This information came from the Management Accounts that AUSA provided to Austal. As explained in the chart below, *see infra* ¶ 71, Austal's results, were overstated by approximately $14.52 million for revenue and EBIT.

Fiscal year 2014, ending June 30, 2014

a. Austal 2014 Annual Report, issued on August 27, 2014, attaching financial statements and containing discussion of financial results;

b. Austal FY2014 results presentation, issued on August 27, 2014, containing discussion of financial results; and

c. Austal press release "Austal Delivers Record Revenue and Reduces Net Debt by 50%," issued on August 27, 2014, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for fiscal year 2014, Austal's revenue was approximately AUD 1.12 billion (approximately $1.05 billion) and EBIT was AUD 55.6 million (approximately $52.3 million). For this period, AUSA reported approximately AUD 933.6 million (approximately $879.4

million) in revenue and EBIT was AUD 61.7 million (approximately $58.1 million). As explained in the chart below, *see infra* ¶ 71, Austal's results, were overstated by approximately $33.53 million for revenue and EBIT.

Half-year H1 2015, ending December 31, 2014

    a. Austal 31 December 2014 H1 Half-Year Report, issued on February 25, 2015, attaching financial statements and containing discussion of financial results;

    b. Austal FY2015 H1 results presentation, issued on February 25, 2015, containing discussion of financial results; and

    c. Austal press release "Austal Delivers Revenue and Earnings Growth; Returns to Dividends," issued on February 26, 2015, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for H1 half-year 2015, Austal's revenue was approximately AUD 680.2 million (approximately $554.8 million) and EBIT was AUD 45.0 million (approximately $36.7 million). For this period, AUSA reported approximately AUD 498.3 million in revenue (approximately $406.4 million) and EBIT was AUD 27.4 million (approximately $22.4 million). As explained in the chart below, *see infra* ¶ 71, Austal's results, were overstated by approximately $17.01 million for revenue and EBIT.

Fiscal year 2015, ending June 30, 2015

    a. Austal 2015 Annual Report, issued on August 26, 2015, attaching financial statements and containing discussion of financial results;

    b. Austal FY2015 results presentation, issued on August 26, 2015, containing discussion of financial results; and

 c. Austal press release "Austal Delivers Record Profit, Increases Dividend," issued on August 26, 2015, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for the full fiscal year 2015, Austal's revenue was approximately AUD 1.41 billion (approximately $1.08 billion) and EBIT was AUD 84.8 million (approximately $64.9 million). For this period, AUSA reported approximately AUD 1.12 billion in revenue (approximately $857.4 million) and EBIT was AUD 58.4 million (approximately $44.7 million). As explained in the chart below, *see infra* ¶ 71, Austal's results, were overstated by approximately $14.15 million for revenue and EBIT.

 <u>Half-year H1 2016, ending December 31, 2015</u>

 a. Austal 31 December 2015 H1 Half-Year Report, issued on February 23, 2016, attaching financial statements and containing discussion of financial results;

 b. Austal FY2016 H1 results presentation, issued on February 23, 2016, containing discussion of financial results; and

 c. Austal press release "Austal Delivers Strong Cashflow, Doubles Interim Dividend," issued on February 23, 2016, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for H1 half-year 2016, Austal's revenue was approximately AUD 747.4 million (approximately $544.7 million) and EBIT was AUD 29 million (approximately $21.1 million). For this period, AUSA reported approximately AUD 638.4 million in revenue (approximately $465.2 million) and EBIT was AUD 26.9 million (approximately $19.6 million). As explained in

the chart below, *see infra* ¶ 71, Austal's results, were overstated by approximately $26.33 million for revenue and EBIT.

67.     AUSA understood that the manipulated EACs in the LCS program directly impacted Austal's financial statements during the Relevant Period. Perciavalle and Runkel were directly involved with AUSA's Management Accounts sent to Austal. Thus, they knew, or were severely reckless in not knowing, that AUSA reported false revenue and EBIT (based on artificially low LCS EACs) to Austal, and that in turn Austal used AUSA's false financial data to support Austal's financial statements. Adams knew, or was severally reckless in not knowing, that the false EACs in the LCS program would ultimately impact Austal's financial statements. Adams admitted to the Material Manager that Austal's stockholders did not know that AUSA, and so Austal, were using artificially low LCS EACs to calculate revenue.

### G.     The Manipulated EACs that AUSA Used to Calculate Revenue and EBIT Reported in Austal's Filings Were Much Lower than the EACs AUSA Submitted to the Navy.

68.     AUSA sent the Navy monthly CPRs, which included the Navy EACs. These Navy EACs reflected higher LCS EACs than the EACs that AUSA used to calculate its revenue and EBIT. Among other things, these CPRs supported AUSA's costs, progress, and timing of building the LCS ships. Thus, AUSA had an incentive to report more accurate LCS EACs to the Navy in order to explain any delays in completion and to justify any attempt to obtain payments from the Navy in excess of the contract amount.

69.     As set forth in the chart below (all numbers below are approximate), comparing the Navy EACs to the LCS EACs that AUSA used to calculate revenue and profit and reported to Austal demonstrates that AUSA understated the LCS EACs by tens of millions of dollars by at least its half-year 2014:

|  | 12/31/13 HY14 | 6/30/14 FY14 | 12/31/14 HY15 | 6/30/15 FY15 | 12/31/15 HY16 |
|---|---|---|---|---|---|
| AUSA's Reported LCS EACs | $1.02 billion | $1.50 billion | $2 billion | $2.53 billion | $2.21 billion |
| Navy EACs | $1.05 billion | $1.56 billion | $2.10 billion | $2.62 billion | $2.36 billion |
| Difference | ($37.75 million) | ($58.18 million) | ($103.87 million) | ($96.40 million) | ($141.93 million) |

**H.    AUSA's False LCS EACs Allowed Austal to Meet or Beat Analyst Consensus Estimates for EBIT.**

70.    Using the manipulated LCS EACs resulted in Austal overstating revenue and profit for at least the half and annual year periods set out in the chart below, thus allowing it to generally meet or beat analyst consensus for EBIT, Austal's most important financial metric.

71.    If AUSA had used the Navy EACs, Austal would have missed, by wide margins, analyst consensus estimates for EBIT for its half-year 2014, fiscal year 2014, half-year 2015, and fiscal year 2015, as well as reported an EBIT loss for half-year 2016, as reflected in the below chart:

|  | Austal's Reported EBIT | Analyst Consensus EBIT | Austal's EBIT if used the Navy EAC |
|---|---|---|---|
| Half-year 2014 | $22.81 million | $20.67 million | $8.29 million |
| Fiscal year 2014 | $61.51 million | $56.94 million | $27.98 million |
| Half-year 2015 | $27.49 million | $27.73 million | $10.48 million |
| Fiscal year 2015 | $56.04 million | $54.93 million | $41.89 million |
| Half-year 2016 | $21.13 million | $23.32 million | $(5.20) million |

72.     All numbers in the above chart are approximate and have been converted into US Dollars from AUD. Further, the analyst consensus EBIT and Austal's reported EBIT numbers listed in the above chart are from Refinitiv Institutional Brokers' Estimate System (I/B/E/S), and the Refinitiv I/B/E/S analysts made certain adjustments to Austal's reported EBIT numbers in order to make these figures comparable to the analyst consensus figures.

73.     While Austal's reported EBIT was approximately $240,000 less than the EBIT analyst consensus for the half-year ended December 31, 2014 (referred to as half-year 2015 in the chart above), this amount is marginal, and analysts and the investing public understood that Austal had met expectations for EBIT for that period. Austal announced these half-year 2015 results on February 25, 2015, and the closing price of Austal's Ordinary Shares stayed consistent around AUD 1.585 to 1.59 per share.

74.     As discussed below, because AUSA was ultimately forced to include some of the cost growth for the half-year ended December 31, 2015 (referred to as half-year 2016 in the chart above), Austal's reported EBIT was lower than the analyst consensus EBIT for that period. Using the Navy EACs for that period, however, would have generated a far larger miss and an EBIT loss.

75.     Overall, by meeting or exceeding analysts' EBIT consensus estimates, Austal's Ordinary Shares and ADRs increased dramatically in price. From the financial period ended December 31, 2013 (reported to the investing public on February 27, 2014) through the financial period ended June 30, 2015 (reported to the investing public on August 26, 2015), Austal's Ordinary Shares increased in value – going from approximately AUD 0.88 per share during late February 2014 to approximately AUD 2.40 per share by late November 2015.

76.     In addition, Austal's Ordinary Shares price and volume sometimes increased substantially after it prematurely recognized revenue and met or beat analyst consensus estimates for EBIT. For example, on August 26, 2015, on the ASX, Austal reported its fiscal year 2015 results for the period ending June 30, 2015, and the next day its Ordinary Shares increased from a closing price of AUD 1.87 to 1.97 a share and its daily volume went from nearly 800,000 to more than 2.5 million.

### I.     The Fraud Comes to an End.

77.     As construction of the LCS ships progressed, the false EACs began to catch up to AUSA. Indeed, by April 2015, the "challenge" that AUSA wanted to apply to LCS 6 was higher than the cost of materials estimated from that point forward to complete the ship. If AUSA had applied the entire challenge, the EAC on LCS 6 would be lower than what AUSA had already spent on LCS 6. As such, AUSA had to recognize the EAC increase on LCS 6.

78.     By the end of 2015, as it was preparing its half-year 2016 financials, AUSA's Navy EACs had grown far beyond the manipulated LCS EACs (as reflected in the chart above). Because certain ships were now completed or nearly completed and AUSA had incurred costs to complete the ships, AUSA had to include these building costs in the EACs. In turn, this negatively impacted AUSA's, and thus Austal's, profit. In fact, on or about September 21, 2015, the former AUSA CFO emailed Austal a PowerPoint informing Austal that AUSA would likely miss its 2016 EBIT target.

79.     On December 10, 2015, Austal announced that its fiscal year 2016 earnings from AUSA would be lower than fiscal year 2015. In response to this announcement, Austal's Ordinary Share on the ASX fell by AUD 0.58, a drop of 25.4%.

80.     Further, by at least May 2016, Austal understood that committed costs on six LCS ships (even numbers 6 through 16) were already much higher than the EACs. Thus, because

these costs were now committed not merely estimated costs, Austal had no choice but to include this cost growth in its LCS EACs.

81.     For several weeks in April through June 2016, Austal's CFO came to AUSA and worked with AUSA personnel to reset the LCS EACs. This process led to Austal's July 4, 2016 press release announcing that a "US$115 million (A$156 million) one off write back of work in progress (WIP) is required to recognize an increase in the cost of construction." The write back led to an EBIT loss of $89.6 million for Austal for fiscal year 2016. Austal's Ordinary Shares on the ASX dropped 8.26% following the announcement.

**J.     Defendants Engaged in Deceptive Acts and Violated Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act.**

82.     Defendants, through Perciavalle, Runkel, and Adams, engaged in a deceptive scheme to artificially reduce the LCS EACs in order to report more revenue to investors for the periods at issue. Based on their titles and job functions, Perciavalle's, Runkel's, and Adams' actions and knowledge are imputed to AUSA and Austal. As a result, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

83.     As described above, Defendants used instrumentalities of interstate commerce in connection with the purchase or sale of Austal's securities.

84.      As detailed above, Defendants, through Perciavalle, Runkel, and Adams, used devices, schemes, or artifices to defraud in connection with the purchase or sale of Austal's securities.

85.     As detailed above, AUSA committed numerous deceptive acts in furtherance of this scheme. Among other things, AUSA:

      a.   Manipulated EACs in the LCS program in response to pressure from Austal executives to meet AUSA's budgeted revenue and EBIT;

b. Falsified the LCS EACs by, among other things: (i) applying management challenges to the LCS material EACs calculated by the Material Manager; and (ii) using either the bid LCS labor hours EACs or LCS labor hours EACs that were lower than the LCS labor hours EACs calculated by LCS personnel;

c. Concealed from the AUSA Board outside managers and Austal Limited Board of Directors that AUSA was artificially lowering the EACs in the LCS program and that AUSA was applying phony management challenges to the LCS material EACs;

d. Hid or deleted specific references to management challenges in various AUSA documents, including the Executive Review meeting PowerPoints;

e. Failed to use the "latest available, reliable information" to calculate the LCS EACs, even though it knew the EACs were objectively false;

f. Generated false financial information that it knew (or was severely reckless in not knowing) would be reported to Austal. It also knew (or was severely reckless in not knowing) that Austal would report this false financial information to the investing public; and

g. Provided higher LCS EAC numbers to the Navy than those that were included in Austal's financials, which demonstrated that it knew the higher labor EACs submitted to the Navy were the better estimate.

86.     Perciavalle, Runkel, and Adams knew or were severely reckless in not knowing that these actions would cause Austal to prematurely and fraudulently recognize revenue for the periods listed above and allow Austal to meet or exceed analyst consensus estimates for EBIT. Perciavalle's, Runkel's, and Adams' scienter is imputed to AUSA.

87.     As detailed above, Austal used devices, schemes, or artifices to defraud in connection with the purchase or sale of Austal's securities and acted knowingly or with severe recklessness. Austal, through Perciavalle, Runkel, and Adams, committed numerous deceptive acts in furtherance of this scheme. Among other things, Austal:

    a.   Pressured AUSA to meet AUSA's budgeted revenue and EBIT;

    b.   Failed to use the "latest available, reliable information" to calculate the EACs, even though it knew (or was severely reckless in not knowing) that the EACs were objectively false; and

    c.   Generated false financial information that it knew (or was severely reckless in not knowing) would be reported to the investing public.

88.     Perciavalle, Runkel, and Adams knew or were severely reckless in not knowing that these actions would cause Austal to prematurely and fraudulently recognize revenue for the periods listed above and allow Austal to meet or exceed analyst consensus estimates for EBIT. Perciavalle's, Runkel's, and Adams' scienter is imputed to Austal.

**K.     Austal Violated Section 10(b) and Rule 10b-5(b) of the Exchange Act and AUSA Aided and Abetted Those Violations.**

89.     Austal violated Section 10(b) and Rule 10b-5(b) of the Exchange Act by making untrue statements of a material fact (or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading) in the above referenced filings, investor presentations, and press releases.

90.     Perciavalle, Runkel, and Adams knew or were severely reckless in not knowing that their actions would cause Austal to prematurely and fraudulently recognize revenue for the periods listed above, issue false financial statements, and allow Austal to meet or exceed analyst

consensus estimates for EBIT. Perciavalle's, Runkel's, and Adams' scienter is imputed to AUSA and Austal.

91.     As described above, Austal used instrumentalities of interstate commerce in connection with the purchase or sale of Austal's securities.

92.     As detailed above, Austal made misrepresentations of material fact, or omitted material fact, regarding its revenues and EBIT contained in the reports, presentations, and press releases listed above, in connection with the purchase or sale of Austal's securities.

93.     AUSA's artificial reductions to the LCS EACs caused Austal to report materially false and misleading information to analysts and the investing public. As set forth above, if AUSA had instead used the Navy EACs, Austal would not have met or beat analyst consensus estimates for EBIT for its fiscal year 2014, half-year 2015, and fiscal year 2015, and would have had to report an EBIT loss for half-year 2016. Further, Austal would have missed the consensus estimates for EBIT by wide margins. In addition, during the time period Austal was making material misstatements and omissions, its Ordinary Shares' price was materially affected as it rose in value and during the time period that Austal started to disclose its fraud its stock price was materially affected as it decreased in value. Lastly, reasonable investors would have wanted to know that the revenue and EBIT number were being intentionally manipulated.

94.     As described above, Austal, through the actions, knowledge, and conduct of Perciavalle, Runkel, and Adams, acted knowingly or with severe recklessness.

95.     As detailed above, AUSA, through the actions of Perciavalle, Runkel, and Adams, aided and abetted these violations by knowingly or recklessly providing substantial assistance to those violations. Among other things, AUSA conducted the EAC manipulation in the LCS

program that led to Austal's fraudulent revenue recognition and false financial statements,

investor presentations and press releases.

## VI.  CLAIMS FOR RELIEF

### First Claim for Relief
**Fraud - Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a) and (c))**
(All Defendants)

96.     The SEC realleges and incorporates by reference in this claim for relief

paragraphs 1 through 95 as if fully restated herein.

97.     Defendants, directly or indirectly, in connection with the purchase or sale of a

security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of

the facilities of a national securities exchange, knowingly and severely recklessly: (a) employed

devices, schemes, or artifices to defraud; and (c) engaged in acts, practices, or courses of

business which operated or would operate as a fraud or deceit upon other persons.

98.     By engaging in the conduct described above, Defendants directly or indirectly

violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

### Second Claim for Relief
**Fraud - Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b))**
(Against Austal)

99.     The SEC realleges and incorporates by reference in this claim for relief

paragraphs 1 through 95 as if fully restated herein.

100.     Austal, directly or indirectly, in connection with the purchase or sale of a security,

and by the use of means or instrumentalities of interstate commerce, of the mails, or of the

facilities of a national securities exchange, knowingly and severely recklessly made untrue

statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

101.   By engaging in the conduct described above, Austal directly or indirectly violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

**Third Claim for Relief**
**Fraud – Aiding and Abetting Austal's Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b))**
(Against AUSA)

102.   The SEC realleges and incorporates by reference in this claim for relief paragraphs 1 through 95 as if fully restated herein.

103.   As alleged above, Austal violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(b).

104.   During the Relevant Period, AUSA knowingly or severely recklessly provided substantial assistance to Austal in furtherance of the violations alleged above.

105.   By engaging in the conduct described above, AUSA aided and abetted and, unless restrained and enjoined, will continue to aid and abet Austal's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## VI.   PRAYER FOR RELIEF

WHEREFORE, the SEC seeks the following relief:

1.   Find that Defendants committed the violations alleged in this Complaint;

2.   Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure and Eleventh Circuit case law, permanently enjoining Defendants and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with them, who receive actual notice of the Final Judgment by personal service or

otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder;

      3.      Order Defendant AUSA to pay a civil money penalty pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and

      4.      Grant such other and further relief as this Court may deem just and proper.

## VII.   JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Dated: August 26, 2024            Respectfully submitted,

By:  *s/ Christopher E. Martin*
      Christopher E. Martin
      Sharan E. Lieberman
      U.S. Securities and Exchange Commission
      1961 Stout Street, Suite 1700
      Denver, CO 80294-1961
      Telephone: 303-844-1106 (Martin)
              303-844-1036 (Lieberman)
              303-844-1000 (Main)

      Email: martinc@sec.gov
             liebermans@sec.gov

      *Attorneys for Plaintiff*
      *U.S. Securities and Exchange Commission*